UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH NEWMAN et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UBER TECHNOLOGIES, INC. et al., | ) | Case No. 4:24-cv-00575-SRC |
| | ) | |
| Defendants. | ) | |
| | ) | |

## Memorandum and Order

Plaintiffs, children of Elijah Newman, have alleged that Torian Wilson shot and killed Newman amid a botched carjacking during a Lyft ride.  Plaintiffs also argue that Uber Technologies, Inc. and Rasier LLC (collectively "Uber") had a hand in Newman's death by their negligence.  According to Plaintiffs, Uber knew that Wilson had committed two prior carjackings on Uber's own ridesharing platform just weeks before he targeted Newman on Lyft. Plaintiffs contend that Uber had seen Wilson's deadly attack coming and sat on its hands, even though it had the legal duty to step in and protect Newman.  Uber moves to dismiss, arguing that it owed Newman no such duty and that Uber's alleged inaction did not cause the attack.  Because Plaintiffs have failed to allege sufficient facts to establish that Uber owed a relevant duty, the Court grants Uber's motion.

## I.    Background

The Court accepts the following well-pleaded facts as true for the purposes of this motion to dismiss.  Uber connects riders, who seek transportation, with drivers, who use their personal vehicles to take the riders where they need to go.  Doc. 2 at ¶ 61.  A rider requests a ride through Uber's online and mobile application, the "Uber App." *Id.*  The Uber App then disseminates the

request to local drivers, who may accept the ride request and, upon completion of the ride, receive compensation. *Id.* For a driver to receive a ride request, he must "log[] onto the Uber App and indicate [his] ability to provide rides." *Id.* at ¶ 87.

Lyft, another transportation company, operates similarly. *See id.* at ¶¶ 65–68. Together, Uber and Lyft pioneered the so-called rideshare industry in the early 2010s. *Id.* While they have remained separate companies through the years, Uber and Lyft mimic each other's operating functions and business practices, and they continue to dominate the rideshare industry. *Id.*

Since its rise to prominence, Uber has repeatedly stressed the importance of safety. *Id.* at ¶ 118. Uber's assurance that it provides the "safest rides on the road" emerged as a theme in its advertisements throughout the 2010s. *Id.* at ¶¶ 118–19. In 2014, Uber began charging riders a $1 fee called a "Safe Rides Fee." *Id.* at ¶ 115. According to Uber, this fee supports Uber's "continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background[-]check process." *Id.* Since 2014, Uber has collected hundreds of millions of dollars through the Safe Rides Fee, but it has never earmarked the proceeds for safety initiatives. *Id.* at ¶ 116. To this day, the theme of safety pervades Uber's marketing strategy. *Id.* at ¶¶ 126–27.

Uber and Lyft launched the Industry Sharing Safety Program in March 2021. *Id.* at ¶¶ 99–100. An Uber press release stated that the Safety Program would enable Uber and Lyft "to exchange basic information about drivers and delivery people who have been deactivated for serious sexual assault or physical assault fatalities." *Id.* at ¶ 100. Ideally, the Safety Program would "prevent these individuals from operating on another platform." *Id.* In a safety report, Uber unilaterally clarified that it would share, with Lyft, "driver deactivations" for five critical safety issues, including murder and other "physical assault fatalities." *Id.* at ¶ 101. After Uber

joined the Safety Program, it promoted its safety efforts in a series of advertising campaigns and public relations efforts.  For example, in a CNN interview, Uber chief legal officer Tony West said that Uber and Lyft "agree that folks should be safe no matter what ridesharing platform they choose."  *Id.* at ¶ 105.

But Uber has made clear that the Safety Program has limits:  Uber never committed to sharing information about dangerous *riders* as part of the Safety Program or any other policy.  *Id.* at ¶ 36.  To be sure, Uber emphasized safety broadly in its marketing efforts, without specific reference to *whose* safety it sought to ensure.  For instance, in a safety report, Uber stated that the Safety Program would "prevent *any offenders* from operating on other platforms and potentially harming others."  *Id.* at ¶ 108.  But in other public documents, Uber indicated that it would *not* share information about *riders* that it had determined to be dangerous.  *Id.* at ¶ 54.

In late March 2021, the same month that Uber and Lyft launched the Safety Program, Wilson used the Uber App, as a rider, to commit an armed carjacking against an Uber driver named Brian Blagoue.  *Id.* at ¶ 22–23.  Wilson used the alias "Robert" when he booked a ride with Blagoue.  *Id.* at ¶ 22.  After Wilson entered Blagoue's car, Wilson brandished a firearm and ordered Blagoue to hand over his phone and car.  *Id.* at ¶ 23.  Blagoue complied, and Wilson fled in the car.  *Id.*  Blagoue called the St. Louis Police Department, which informed him that it would solicit information from Uber about the rider's identity.  *Id.* at ¶ 24.  Blagoue informed Uber of the attack later that day.  *Id.* at ¶ 25.

The same day, Wilson committed another armed carjacking of a different Uber driver. *Id.* at ¶ 26.  As he did in the first attack, Wilson booked an Uber ride in St. Louis under the alias "Robert."  *Id.* at ¶ 27.  Upon arriving at his selected destination, Wilson brandished a firearm and

3

ordered the driver out of the car. *Id.* The driver complied, Wilson fled, and the driver notified the St. Louis Police Department and Uber. *Id.* at ¶¶ 27–30.

Uber possessed critical information about "Robert's" true identity because Wilson used his authentic email address ("torianwilson10@gmail.com") when he registered for his Uber account. *Id.* at ¶ 31–32. But Uber did not release this information, or any other identifying information, to the police or to Lyft. *Id.* at ¶¶ 35–36.

Three weeks after the two carjackings, on the night of April 15, 2021, Wilson struck again. *Id.* at ¶¶ 26, 31. But this time, instead of using Uber, he used Lyft. *Id.* at ¶ 31. Wilson used the same alias that he had used in the prior carjackings. *Id.* at ¶ 32. And he had registered his Lyft account to the same email address and cell phone number as he had registered his Uber account. *Id.* at ¶¶ 31–32. Wilson requested a ride to the same destination where he had committed the first carjacking. *Id.* at ¶ 33. Newman, who drove for both Uber and Lyft and was accepting ride requests through both platforms that night, accepted the request through Lyft's app. *Id.* at ¶¶ 38–41. Forty-two minutes later, St. Louis Homicide Detectives found Newman slumped over in his vehicle near the destination, with a gunshot wound to the upper back. *Id.* at ¶¶ 40, 44–45. Authorities pronounced Newman dead. *Id.* at ¶ 45.

Once Uber caught wind of Newman's death, it shared the information it had about Wilson with the police. *Id.* at ¶ 46. Using that information, police identified, located, and arrested Wilson the day after Newman's death. *Id.* Wilson eventually pleaded guilty to the murder. *Id.* at ¶ 49.

Plaintiffs sued Wilson and Uber in Missouri state court on April 12, 2024. *See id.* at ¶ 184. Against Wilson, Plaintiffs asserted claims of negligence, assault and battery. *Id.* at

4

¶¶ 173–183.  Against Uber, Plaintiffs asserted a single claim of negligence.  *Id.* at ¶¶ 151–172.

Uber filed a Notice of Removal one week later.  *See* doc. 1.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for

"failure to state a claim upon which relief can be granted."  The notice pleading standard of

Rule 8(a)(2) requires a plaintiff to give "a short and plain statement . . . showing that the pleader

is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To meet this standard and to survive a

Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This requirement of

facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  The

Court must grant all reasonable inferences in favor of the nonmoving party.  *Lustgraaf v.

Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010).  Ordinarily, the Court considers only the facts

alleged in the complaint when ruling on a motion to dismiss; however, the Court may consider

materials attached to the complaint in construing the complaint's sufficiency.  *Reynolds v.

Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor

of the plaintiff."  *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir.

2010).  However, if a claim fails to allege one of the elements necessary to recover on a legal

theory, the Court must dismiss that claim for failure to state a claim upon which relief can be

granted.  *See Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022) (citing

*Twombly*, 550 U.S. at 562).  Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice.  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.  "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement will not suffice."  *Hamilton v. Palm*, 621 F.3d 816, 817–18 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation.  *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677–78.

Only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Iqbal*, 556 U.S. at 679.  Therefore, the Court must determine if the well-pleaded factual allegations "plausibly give rise to an entitlement to relief."  *Id*.  This "context-specific task" requires the Court to "draw on its judicial experience and common sense."  *Id*.  The Court must then determine whether the plaintiff plausibly alleges a violation of the law.  *Iqbal*, 556 U.S. at 682.  The well-pleaded facts must permit more than the "mere possibility of misconduct."  *Id.* at 679.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).

## III.    Discussion

The parties appear to agree that Missouri tort law applies to this dispute.  *See* doc. 18 at 8[1] (arguing that, "under Missouri precedent, Uber cannot be held liable"); doc. 25 at 7 (citing Missouri caselaw for the proposition that Uber owed a legal duty).  Upon review of the

---

[1] The Court cites to page number as assigned by CM/ECF.

applicable choice-of-law principles and the facts of this case, the Court finds that the parties properly rely on Missouri law. Accordingly, the Court will apply Missouri law in this case.

To state a claim for negligence under Missouri law, Plaintiffs must allege facts that would suffice to establish three elements: (1) "the defendant owed a duty of care to the plaintiff," (2) "the defendant breached that duty," and (3) "the defendant's breach proximately caused the plaintiff's injury." *Harner v. Mercy Hosp. Joplin*, 679 S.W.3d 480, 484 (Mo. 2023) (citation omitted); *see Iqbal*, 556 U.S. at 678. In its motion to dismiss, Uber contends that Plaintiffs failed to adequately plead the first and third elements. Doc. 18 at 12–21. The Court agrees that the complaint fails to establish a duty. Thus, the Court does not reach the issue of causation.

"Whether a duty exists is purely a question of law." *State ex rel. Tyler Techs., Inc. v. Chamberlain*, 679 S.W.3d 474, 477 (Mo. 2023) (quoting *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 654 (Mo. 2019)). Thus, the Court can properly resolve the question of duty on a motion to dismiss. *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Raczkowski*, 764 F.3d 800, 802 (8th Cir. 2014) (affirming the dismissal of a negligence claim because the appellee did not owe a legal duty under Missouri law).

To determine whether a duty exists under novel circumstances, the Court looks to "relevant state precedent, analogous decisions, considered dicta, and any other reliable data to determine how the Missouri Supreme Court would construe the law." *Id.* at 803 (quoting *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009)).

Before extending a legal duty to a novel set of facts, the Court must exercise caution. In *National Union*, an insurance company sued a bank for negligence after the bank failed to inquire into whether an employee had the authority to open an account on the employer's behalf. *Id.* at 801. The district court dismissed the complaint for failure to state a claim because the bank

owed no duty to the employer. *Id.* And the Eighth Circuit affirmed. *Id.* For the proposition that the Supreme Court of Missouri would recognize a duty, the insurance company relied on a Supreme Court of Missouri decision that was "materially different" from the case at hand and "limited in scope" compared to the insurance company's proposed duty. *Id.* at 804. To extend that precedent to the case before it, the court held, would be to establish a rule with "no practical limitation." *Id.* at 805.

Here, Plaintiffs contend that Uber owed not only its own contractors but also Lyft drivers a duty "to protect them from known, dangerous passengers." Doc. 2 at ¶ 153. In other words, Plaintiffs ask the Court to impose a duty on a business for a crime committed on the platform of a competitor's business. But Plaintiffs have failed to point to any case in which a Missouri court imposed a duty on one business to protect the contractors or employees of a competitor's business. The Court has found no such case through its own research, either. Thus, the Court evaluates Plaintiff's claim of duty with caution, using "relevant state precedent, analogous decisions, considered dicta," and "other reliable data" as its lodestar. *See Nat'l Union*, 764 F.3d at 803.

Two theories, Plaintiffs argue, give rise to Uber's duty to Newman. First, Uber created a foreseeable "risk" that a dangerous rider would harm Newman.. Doc. 2 at ¶ 156. Second, Uber "voluntarily undertook" to provide safe rides for all rideshare users, not just Uber riders. *Id.* at ¶ 155. The Court considers each theory in turn.

### A.    Duty based on a foreseeable risk

Plaintiffs argue that two of Uber's actions suffice to establish a duty because they created a foreseeable risk of Newman's death. Doc. 25 at 9. First, "Uber took affirmative steps to establish the Rideshare Marketplace," which became "a hunting ground for would-be

carjackers." *Id.* (citing doc. 2 at ¶¶ 67, 135–37).  Second, Uber "made specific, affirmative choices about what data to share with Lyft and police and promised to promptly respond to incidents." *Id.* (citing doc. 2 at ¶¶ 74–75, 112).

Under Missouri law, businesses generally have no duty to protect even *their own* invitees "from criminal acts of third persons." *Harner*, 679 S.W.3d at 484.  Although exceptions to the general rule exist, they are "limited" and require "special facts and circumstances" that "render injury foreseeable in a given case." *Id.* (citing *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co.*, 75 S.W.3d 247, 257 (Mo. 2002)).

Plaintiffs argue that an exception to the general rule applies.  In Missouri, a defendant has a duty to protect the plaintiff if the defendant "creates a condition" that will foreseeably cause a third party to commit an "intentional injury" against the plaintiff.  *Hyde v. City of Columbia*, 637 S.W.2d 251, 272 (Mo. Ct. App. 1982) (citing *Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo. 1976)).  But that duty arises only "when one should realize through special facts within his knowledge or a special relationship that an act or omission exposes someone to an unreasonable risk of harm through the conduct of another." *Irby v. St. Louis Cnty. Cab Co.*, 560 S.W.2d 392, 395 (Mo. Ct. App. 1977) (citation omitted).

To apply this exception here, Plaintiffs rely heavily on two cases.  *See* doc. 25 at 7–10. First, they rely on *Scheibel*.  In that case, Dennis Scheibel sued Betty Hillis for negligence after a third party, Richard Joyner, shot Scheibel in Hillis's home with Hillis's shotgun.  531 S.W.2d at 287.  The trial court held that Scheibel had failed to state a claim for negligence, and the Missouri Court of Appeals affirmed the dismissal because Scheibel had not adequately alleged a duty.  *Id.* at 287, 289.  But the Supreme Court of Missouri reversed the dismissal and remanded the case.  *Id.* at 290.  The court explained that Hillis owed Scheibel a duty of "reasonable care"

because Scheibel was a known visitor on Hillis' "owner-occupie[d]" property. *Id.* at 288. And Scheibel alleged both that Hillis knew that Joyner had committed dangerous acts in the past and that Hillis had stored the weapon in a place where Hillis should have known that Joyner would find it. *Id.* at 287. These facts sufficed to survive a motion to dismiss under then-controlling Missouri procedural law, which provided that a plaintiff need allege only the "ultimate facts" to survive a motion to dismiss, not "facts or circumstances" that establish the "ultimate facts." *Id.* at 290.

Plaintiffs also rely on *Hyde*. Doc. 25 at 7–10. There, Sandra Hyde sued the City of Columbia and two Columbia newspapers for negligence after the police department disclosed Hyde's name and address to the newspapers after Hyde reported to the police that someone had kidnapped her. *Hyde*, 637 S.W.2d at 253. The newspapers published Hyde's name and address, and the still-at-large kidnapper used the information to terrorize Hyde and cause her emotional distress. *Id.* The trial court dismissed the negligence claims for failure to state a claim. *Id.* at 254. But the Court of Appeals reversed. *Id.* at 273. The court relied on the fact that Hyde had made an "official report" of the kidnapping to the police. *Id.* at 258. And both the police department and the newspapers knew that the unknown kidnapper remained "at large" and that Hyde did not consent to the publication of her personal information. *Id.* The court held that the defendants owed a duty to Hyde because the "release" and "publication" of Hyde's name and address under these circumstances had created an "especial temptation and opportunity" for the kidnapper to terrorize Hyde. *Id.* at 258. Thus, Hyde adequately pleaded the element of duty. *Id.* at 273.

Plaintiffs' reliance on *Scheibel* and *Hyde* is misplaced. The *Scheibel* court held that Hillis owed a duty of "reasonable care" because she was an "owner-occupier of land," and

Scheibel was a "known" visitor on the same land.  531 S.W.2d at 288.  Missouri courts have refused to extend *Scheibel* to cases where the plaintiff suffered an injury outside the defendant's owner-occupied premises.  *See, e.g.*, *Thompson v. Tuggle*, 183 S.W.3d 611, 615 (Mo. Ct. App. 2006) (distinguishing *Scheibel* because the defendant did not have "control over the premises" where the injury occurred); *Conroy v. City of Ballwin*, 723 S.W.2d 476, 479 (Mo. Ct. App. 1986) (distinguishing *Scheibel* because the plaintiff's injury occurred outside the boundaries of the appellee city); *A.R.R. v. Tau Kappa Epsilon Fraternity, Inc.*, 649 S.W.3d 1, 16–17 (Mo. Ct. App. 2022) (holding that a fraternity owed no duty to prevent a sexual assault in its fraternity house because the fraternity neither "occupied" nor "had the intent to control the fraternity house").  Here, Wilson shot and killed Newman in Newman's vehicle, which Uber neither owned nor occupied.  *See* doc. 2 at ¶¶ 38–41, 44–45; *Scheibel*, 531 S.W.2d at 288.  And Lyft's app, not Uber's, organized the fatal ride.  Doc. 2 at ¶¶ 38–41.  Even though Newman also drove for Uber and was accepting ride requests from Uber on the night of the murder, doc. 2 at ¶¶ 38–39, the complaint makes no allegation that Uber owned or exercised any control over Newman's vehicle at any relevant time.

*Hyde* does not establish a duty here, either.  In *Hyde*, the defendants affirmatively "create[d] a condition" that afforded the kidnapper a "peculiar opportunity" to terrorize Hyde.  637 S.W.2d at 257, 272.  They did this by disclosing and publishing the private name and address of a kidnapping victim.  *Id.* at 253.  In contrast, Plaintiffs here allege that two of Uber's actions foreseeably caused Newman's murder:  (1) Uber took "affirmative steps to establish the Rideshare Marketplace," and (2) Uber "made specific, affirmative choices about what data to share with Lyft and police and promised to promptly respond to incidents."  Doc. 25 at 9.  As

11

explained below, neither of these actions give rise to a *Hyde* duty because they did not foreseeably cause Newman's murder.

### 1.    Uber's establishment of the rideshare industry

On the first point, Plaintiffs fail to establish that Newman's murder was the reasonably foreseeable consequence of Uber's development of the rideshare industry.  The Missouri Court of Appeals defined reasonable foreseeability in *Irby*.  There, the widow of a cab driver sued the cab company for negligence after the company dispatched the driver to a high crime area where someone murdered the driver.  *Irby*, 560 S.W.2d at 393.  The trial court held that the cab company did not owe a duty to prevent the driver's murder, so it dismissed the claim.  *Id.* at 394.  The Missouri Court of Appeals affirmed.  *Id.* at 396.  The widow alleged that, because of the "high frequency" of criminal activity in the neighborhood, the driver's murder was foreseeable.  *Id.* at 395.  But that wasn't enough to establish a duty.  Absent "special facts" within the company's knowledge or a "special relationship" between the company and the driver, the murder was not "reasonably foreseeable," even though it took place in a "high crime area."  *Id.*  And because the widow had failed to identify a source of law that imposed a duty in analogous circumstances, the general rule—that the defendant owed no duty—controlled.  *Id.*

Here, Plaintiffs do not specify what exactly was reasonably foreseeable:  carjackings and murders *generally*, or Newman's murder *specifically*.  *See* doc. 25 at 7–10.  But either way, the complaint fails to allege reasonable foreseeability.

To the extent that Plaintiffs argue that carjackings and murders *generally* were a foreseeable byproduct of Uber's innovation, *Irby* resolve the issue in Uber's favor.  Assume that Uber, as it developed the rideshare industry, knew that carjackers and murderers would use ridesharing platforms like Uber and Lyft.  If that knowledge sufficed to establish a duty, then the

fact that the cab company in *Irby* knew that it regularly dispatched its drivers to a "high crime area" (perhaps one inhabited by murderers) would have been enough to impose a duty on the cab company. *See Irby*, 560 S.W.2d at 395. But it wasn't. *See id.*

So too here. Plaintiffs argue that Uber bears responsibility for merely allowing Newman to operate in the high-crime area that the ridesharing industry had become. *See id.*; doc. 40 at 7 (arguing that Uber owed a duty to Newman because Uber "established a brand-new industry that enabled any member of the public to summon a driver to their location and climb into the backseat, no questions asked"). Even ignoring the fact that the cab company in *Irby* almost certainly allowed "any member of the public to summon a driver to their location and climb into the backseat, no questions asked," *id.*, (as is the practice of all cab companies of which this Court is aware), *Irby* rejects Plaintiffs' theory of duty. The fact that a ridesharing platform may amount to a high-crime area does not, on its own, force Uber to bear responsibility for the specific crimes that third parties commit when using the platform. *See Irby*, 560 S.W.2d at 395. Still less are those crimes reasonably foreseeable to Uber when they occur not on Uber, but on a competitor's platform. *See id.* Under Plaintiffs' theory, the Wright Brothers, oft credited as the fathers of aviation, would be liable to every employee of every airline for every hijacking on any airline ever, an absurd proposition. The Court finds that the Supreme Court of Missouri would not, based on its existing precedent, extend a duty in these circumstances and declines to impose this duty, which "admits of no practical limitation." *See Nat'l Union*, 764 F.3d at 805.

Plaintiffs distinguish *Irby* on one point—Uber knew that Wilson had committed two prior carjackings, while the cab company in *Irby* knew only of a "generalized" risk of crime in the high-crime area. Doc. 25 at 9. But that distinction doesn't make a difference. Although Uber knew that Wilson had committed two prior carjackings, *see* doc. 2 at ¶¶ 25, 28, Plaintiffs fail to

allege that Wilson posed a specific threat *to Newman*. At most, they allege that Wilson posed a *general* threat to rideshare drivers. *See, e.g.*, doc. 2 at ¶ 5 (alleging that "Uber was in possession of information and on full notice that . . . Wilson . . . was a threat to the safety of rideshare drivers on any platform, including Uber and Lyft"). But that's no different from *Irby*, where the cab company subjected its driver to a general threat of criminal activity by dispatching him to a dangerous neighborhood. *See Irby*, 560 S.W.2d at 395–96.

This case stands in stark contrast to *Hyde*, where the defendants knew that a specific person (the kidnapper) posed a specific threat (based on his past kidnapping of Hyde) to a specific victim (Hyde) if the kidnapper got his hands on Hyde's personal information. *See Hyde*, 637 S.W.2d at 258 (holding that the "conditions" that the defendants had created "posed an especial temptation and opportunity to the third-party assailant for intentional and criminal aggression upon the victim"). Without that specificity, the duty that Plaintiffs ask the Court to impose lacks a "limiting principle." *Nat'l Union*, 764 F.3d at 804. Indeed, the proposed duty would force Uber to protect every driver of every rideshare platform from every known carjacker. Plaintiffs' theory proves too much.

To the extent that Plaintiffs argue that Wilson's *specific* murder of Newman was the reasonably foreseeable consequence of Uber's development of the rideshare industry, the allegations in the complaint fail to support Plaintiffs' theory. Nowhere do Plaintiffs allege that Uber even knew that Wilson *existed* when it first developed the rideshare industry—much less that it knew that he had the propensity to use the rideshare industry for criminal purposes, and still less that the murder of Newman (during a Lyft ride) was reasonably foreseeable to Uber. *See id.*

14

### 2.    Uber's "affirmative choices" about what data to share

Plaintiffs' second point also fails to establish a duty. If making "affirmative choices" about sharing information about criminal activity created a duty, then *Irby* would have come out the other way.  In that case, Irby alleged that the cab company failed to "exercise discretion" in its dispatching of drivers to high-crime areas.  *See Irby*, 560 S.W.2d at 395.  But that didn't give rise to a duty. *See id.*  Likewise, Uber's "affirmative choices" about what information to share about passengers don't give rise to one here.  *See* doc. 25 at 9.

*Hyde* is also materially distinguishable on this point.  Even if one could fairly characterize Uber's "choices about what data to share with Lyft" as "affirmative" acts, *see id.*, it does not follow that those decisions "create[d] a condition" that gave Wilson a "peculiar opportunity" to murder Newman.  *Hyde*, 637 S.W.2d at 257, 272.  In *Hyde*, the kidnapper would not have had the opportunity to terrorize Hyde had the defendants not committed the serious misstep of publishing Hyde's private information.  *See id.* at 253.  But here, the conditions that gave rise to Newman's murder, and for which Plaintiffs seek to hold Uber responsible, were (1) Wilson's active Lyft account, and (2) the police's failure to apprehend Wilson for the two prior carjackings.  *See* doc. 25 at 9 & n.5.  Though Uber might have failed to *remove* these conditions, Uber in no way created them.  *See Hyde*, 637 S.W.2d at 272.

Plaintiffs have failed to identify a case where a Missouri court imposed a duty in circumstances sufficiently analogous to those here.  The cases on which Plaintiffs rely are "materially different" and "limited in scope" relative to the duty they seek to impose on Uber, and no "limiting principle" can justify imposing that duty on Uber without opening the door to holding other businesses liable for commercial innovations that unforeseeable bad actors later

commandeer for harmful purposes. *See Nat'l Union*, 764 F.3d at 804. Thus, Uber owed no duty to Newman based on a foreseeable risk. *See Irby*, 560 S.W.2d at 395.

### B.    Duty based on a voluntary undertaking

Plaintiffs also contend that Uber owed Newman a duty because Uber voluntarily undertook to safeguard Newman's safety from Wilson's attack. Doc. 25 at 10–15. Evidence of this voluntary undertaking, Plaintiffs contend, comes from Uber's safety promotions, advertisement of its participation in the Safety Program, and policies regarding cooperation with law enforcement. *Id.*; doc. 2 at ¶ 158. And, so the argument goes, this duty extends not only to Uber users while they use Uber but also to Lyft's drivers because Uber joined the Safety Program to protect users of both networks. Doc. 2 at ¶ 161.

Plaintiffs' theory of voluntary undertaking fails, Uber contends, because the duty that Plaintiffs assert lies outside the scope of Uber's undertaking. Doc. 18 at 16–19. Because Plaintiffs have failed to allege that Uber undertook to render services to Newman, the Court agrees with Uber.

To establish a duty based on a voluntary undertaking, a tort plaintiff must allege facts that satisfy two elements. First, the plaintiff must allege that the defendant "undertook 'to render services'" that the defendant should have recognized as "necessary for the protection" of the plaintiff. *See Green v. Unity Sch. of Christianity*, 991 S.W.2d 201, 205 (Mo. Ct. App. 1999) (citation omitted); *Iqbal*, 556 U.S. at 678. Second, the plaintiff must allege that the defendant failed to exercise reasonable care during the undertaking, such that the defendant "increase[d] the risk of harm" to the plaintiff or such that the plaintiff "relied to his detriment on the voluntary undertaking." *Junior Coll. Dist. of St. Louis v. City of St. Louis*, 149 S.W.3d 442, 451 (Mo.

16

2004); *see also Green*, 991 S.W.2d. at 205–06. Defendants contest only the first element. *See* doc. 18 at 16–19. Thus, the Court addresses only the first element.

For an undertaking to exist, the defendant must have "set about" to assume an "obligation to render services" to the plaintiff. *Green*, 991 S.W.2d at 205–06. A defendant's promise may amount to an undertaking if the plaintiff actually relied on the defendant's representations. *See id.* at 206.

For example, in *Taticek v. Homefield Gardens Condominium Ass'n*, the Missouri Court of Appeals held that a condominium association had voluntarily undertaken a duty to protect one of its residents, Mary Beth Taticek, from a dog attack. 502 S.W.3d 645, 652 (Mo. Ct. App. 2016). Taticek sued the condominium association for negligence after a pit bull attacked her in the common area of the condominium complex. *Id.* at 647. The trial court granted summary judgment to the association because it held that the association owed Taticek no duty. *Id.* But the Court of Appeals reversed. *Id.* at 652. Before the attack, the association had "created rules specifically related to dogs," and it had hired a management group to enforce them. *Id.* at 651. Those rules provided that the association would conduct "regular inspections" to ensure that no resident kept a dog that weighed more than 25 pounds. *Id.* at 649–50. The association "distributed" the rules "to the condominium residents," and had "[taken it] upon [itself] to enforce the rules." *Id.* at 652. Thus, the court held that the association had assumed a duty by a voluntary undertaking. *Id.*

In reaching that conclusion, the Court of Appeals distinguished *Green*, where the Court of Appeals had held that no voluntary undertaking existed. *Id.* at 651–52. In *Green*, Wandra Green sued the Unity School for negligence after her husband died in a lake that the school owned. 991 S.W.2d at 202–03. The trial court granted summary judgment to the school

17

because Green failed to establish that the school owed her husband a duty. *Id.* at 204. The Court of Appeals affirmed. *Id.* at 206. In a brochure, the school had represented that it would "provide security and emergency response capability 24 hours a day." *Id.* But that wasn't enough to establish an "undertaking" because the record showed "no evidence that the decedents [had] even [known] about this brochure," much less that they had actually relied upon its representations. *Id.*

Here, Plaintiffs claim that Uber made 11 voluntary undertakings to secure Newman's safety. *See* doc. 25 at 11–15. The alleged undertakings fall into three categories: (1) that Uber, through assurances in safety reports and marketing materials, voluntarily undertook to provide safe rides to all users; (2) that Uber, by joining the Safety Program and making associated statements about securing user safety, voluntarily undertook to share information about dangerous riders to Lyft; and (3) that, Uber, through statements and policy, voluntarily undertook to assist law enforcement in apprehending users who had committed dangerous crimes through Uber's platform. *See id.* The Court turns to each alleged undertaking.

### 1.    Statements about safe rides

Plaintiffs point to Uber's emphasis on safety in its advertisements and press releases and its imposition of the Safe Rides Fee as evidence of a voluntary undertaking to guarantee user safety. *See* doc. 2 at ¶¶ 114–119; doc. 25 at 11. Although these statements and policies may showcase Uber's verbal commitment to the safety of its users, they fail to establish a relevant legal duty here for two reasons.

First, the complaint fails to allege that Newman relied on Uber's safety statements. *See generally* doc. 2. The complaint lacks any allegation that Newman even knew that Uber's marketing efforts existed, much less that Newman "relied on" those efforts when he signed up to

drive not for Uber but for Lyft, a separate platform. *See Green*, 991 S.W.2d at 206; *see generally* doc. 2. Still less does the complaint allege that Newman "relied on" Uber's commitment to safety when he accepted Wilson's ride request through Lyft. *See id.*; *Green*, 991 S.W.2d at 206. And unlike in *Taticek*, where the association "took [it] upon [itself]" to enforce specific rules and regulations about dogs, Uber's general statements about safety do no such thing. 502 S.W.3d at 652. Rather than establish a specific rule that every ride on every ridesharing platform be perfectly safe, the statements, at most, show Uber's "commit[ment] to helping to create a safe environment" for its own users. *See* doc. 2 at ¶ 126. And while the Safe Rides Fee *is* a specific rule, *see id.* at ¶ 115, Plaintiffs do not allege that Uber failed to follow it—only that Uber chose not to earmark receipts of Safe Rides Fees for safety efforts, *id.* at ¶ 116. Uber's safety promotions stand in stark contrast to the specific rules in *Taticek*, which the association undertook to enforce. *See Taticek*, 502 S.W.3d at 652.

Second, the statements promise only that *Uber* is a safe platform, not that Uber will protect its users outside the Uber App. *See, e.g.*, doc. 2 at ¶ 114 (alleging that an Uber official said "that every ride *on the Uber platform* is safer than a taxi" (emphasis added)); *id.* at ¶ 115 (describing Uber's statement that the Safe Rides fee will support "continued efforts to ensure the safest possible platform *for Uber riders and drivers*" (emphasis added)); *id.* at ¶ 123 (describing Uber's advertisement that "every part *of the Uber experience* is designed around your safety and security" (emphasis added)). Newman accepted Wilson's ride request through *Lyft*, not Uber. *See* doc. 2 at ¶¶ 40–45. Thus, Plaintiffs' proposed duty falls outside the scope of the alleged undertaking. By promoting the safety of Uber's platform, Uber in no way "assumed an obligation or intended to benefit" Newman *as a Lyft driver*. *See Doe by & through Doe v. Ozark*

*Christian Coll.*, 579 S.W.3d 220, 224 (Mo. Ct. App. 2019).  Thus, Uber didn't undertake a duty to ensure that Wilson's Lyft ride was safe for Newman.

2.    Participation in the Safety Program

Plaintiffs contend that Uber's participation in the Safety Program amounts to a voluntary undertaking.  And unlike generic statements about user safety, Plaintiffs conclude, Uber entered the Safety Program to protect users of *both* Uber *and* Lyft.  *See* doc. 25 at 12.  But here again, Plaintiffs attempt to broaden the scope of Uber's promises, to the extent they are promises, beyond the allegations in the complaint.

Even though it appears that Uber established the Safety Program to protect users of both networks, *see* doc. 2 at ¶ 100, Uber promised to protect the safety of only certain users—riders. The complaint admits that Uber and Lyft promised to exchange information about "drivers" and "delivery people" who were "*deactivated* for *serious sexual assault* or *physical assault fatalities*."  *See id.* (emphasis added).  Nowhere does the complaint allege that Wilson was a driver or delivery person.  *See* doc. 2.  Nowhere does it allege that Uber had deactivated Wilson. *See id.*  And nowhere does it allege that Wilson had committed a "serious sexual assault" or a "physical assault fatality" before he murdered Newman—only that he had committed two prior carjackings.  *See id.*  In sum, Uber neither "assumed an obligation [nor] intended to benefit" Newman by establishing the Safety Program.  *See Doe*, 579 S.W.3d at 224.

In a desperation heave to broaden the scope of Uber's promises, Plaintiffs point to Uber's ancillary statements about the Safety Program.  For instance, Plaintiffs cite to a CNN interview in which Uber's chief legal officer stated that "folks should be safe no matter what ridesharing platform they choose" without distinguishing between drivers and riders.  *See* doc. 2 at ¶ 105. Plaintiffs also refer to an Uber report stating that the Safety Program would prevent "any

offenders" (in other words, not just drivers and delivery people) from using either platform. *Id.* at ¶ 108. But in context, the complaint itself belies the contention that these statements amount to a voluntary undertaking sufficient to establish a duty. For one, the same safety report that discusses protecting users from "any offenders" clarifies that the Safety Program applies only to "driver deactivations related to physical assault fatalities" and other similar misdeeds. *See id.* at ¶ 101. And Plaintiffs even admit in their complaint that Uber stated in public documents that it had "deliberately decided **not** to share serious safety incident information about their riders" with Lyft. *Id.* at ¶ 54. By participating in the Safety Program, in no sense did Uber "take [it] upon [itself]" or "set about" to exchange information about dangerous *riders* with Lyft. *See Green*, 991 S.W.2d at 206.

### 3.    Cooperation with law enforcement

Finally, Plaintiffs contend that Uber voluntarily undertook to assist law enforcement in apprehending persons who had committed dangerous acts during Uber rides. Doc. 25 at 15. They argue that "Uber committed to utilize the Law Enforcement Response Team . . . Portal to timely provide police with information about safety incidents." *Id.* (citing doc. 2 at ¶¶ 91–94, 133–37). And, they continue, Uber "committed to '[d]iligently provide information' in response to law enforcement requests." *Id.* (alteration in original) (citing doc. 2 at ¶¶ 133–37). But the allegations in the complaint don't say that. The first set of allegations that Plaintiffs cite says only that "Uber *decides* what information it will relay to Police" through the Law Enforcement Response Team Portal—not that Uber had *promised* to relay any information. *See* doc. 2 at ¶ 94 (emphasis added). And the second set says only that "Uber was aware of and was even tracking the number of carjackings against Uber drivers far before . . . Newman was murdered." *Id.* at ¶ 135. Nowhere do Plaintiffs allege that Uber *committed* to sharing this information with Lyft or

21

law enforcement. *See id.* Disregarding Plaintiffs' characterization of the facts, the Court concludes that the well-pleaded factual allegations in the complaint fail to "plausibly give rise" to the conclusion that Uber "[took it] upon [itself]" to relay information about Wilson's carjackings to law enforcement. *See Iqbal*, 556 U.S. at 679; *Green*, 991 S.W.2d at 206.

Under existing Supreme Court of Missouri precedent and otherwise, Uber owed no duty to protect Newman from Wilson's attack. Because Plaintiffs cannot recover for negligence without establishing that Uber owed Newman a duty, *see Harner*, 679 S.W.3d at 484, the Court declines to pass on the question of causation*, see M.B. v. Live Nation Worldwide, Inc.*, 661 S.W.3d 342, 353 (Mo. Ct. App. 2022) (declining to reach the causation issue after finding that the defendant owed no duty to the plaintiff); *Irby*, 560 S.W.2d at 396 (same).

## IV.    Conclusion

Accordingly, the Court grants Uber's [17] Motion to Dismiss. The Court dismisses, without prejudice, Count I of Plaintiffs' complaint. Doc. 2 at ¶¶ 151–72. A separate order of dismissal accompanies this memorandum and order.

So ordered this 13th day of November 2024.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE