**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| Joseph Newman, Ishmeal Newman, Abigail Newman, Bethel Newman, individually and as the Heirs and Next of Kin of Elijah Newman, | **Cause No. 4:24-cv-00575** |
| Plaintiffs, | |
| v. | |
| Uber Technologies, Inc. a Delaware corporation, and Rasier, LLC. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>AMENDED COMPLAINT</u>

## I.    Introduction

1. Plaintiffs Joseph Newman, Ishmeal Newman, Abigail Newman, and Bethel Newman ("Plaintiffs") by and through their undersigned counsel, make the following Petition against Defendants Uber Technologies, Inc., a Delaware corporation (individually "Uber Inc."), Rasier, LLC, a Delaware limited liability company (individually, "Rasier") (collectively "Uber" or "The Uber Defendants"), and Torian Wilson.[1]

2. Prior to his murder, Elijah Newman was an Uber and Lyft Driver in St. Louis, MO.

3. On April 15, 2021, while working as a driver for Lyft, Elijah Newman was murdered by Lyft Rider Torian Wilson during an attempted carjacking of Elijah Newman's vehicle at gunpoint. When Elijah Newman refused to turn over his car to Lyft Rider Torian Wilson, Torian Wilson fatally shot Elijah Newman in the neck.

4. Unfortunately, Elijah Newman was not Torian Wilson's first carjacking victim. In fact, Torian Wilson committed at least two carjackings of **Uber Drivers** at gunpoint **prior** to the carjacking murder of Elijah Newman.

5. Prior to the murder of Elijah Newman, Uber was in possession of information and on full notice that its passenger, Torian Wilson, was a threat to the safety of rideshare drivers on **any** platform, including Uber and Lyft.

## II. Parties

6. The surviving Plaintiff Children of Elijah Newman bring this action pursuant to The Missouri Wrongful Death Statute, Mo. Rev. Stat. § 537.080, et seq., on behalf of themselves and all others entitled to recover under said statute.

---

[1] Plaintiffs bring suit pursuant to the causes of action and facts articulated herein and pursuant to Mo. Stat. § 537.080.

7. Decedent Elijah Newman was a resident of the City of St. Louis, Missouri and died on April 15, 2021.

8. Plaintiff Joseph Newman is a resident of the Republic of Ghana. Plaintiff Joseph Newman is the son of Elijah Newman.

9. Plaintiff Ishmeal Newman is a resident of the Republic of Ghana. Plaintiff Ishmeal Newman is the son of Elijah Newman.

10. Plaintiff Abigail Newman is a resident of the Republic of Ghana. Plaintiff Abigail Newman is the daughter of Elijah Newman.

11. Plaintiff Bethel Newman is a resident of the Republic of Ghana. Plaintiff Bethel Newman is the daughter of Elijah Newman.

12. Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, San Francisco County, California 94158.

13. Defendant Rasier, LLC is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its corporate headquarters, principal office, and principal place of business at 1515 3rd St., San Francisco, California, 94158.

14. Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc. and Rasier, LLC collectively as "Uber." Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Uber Defendant was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each other Defendant, and was at all relevant times acting within the course and scope of said relationship when Decedent was injured.

15. Plaintiff is further informed and believes, that at all relevant times, the Uber Defendants, through their officers, directors, supervisors and managing agents, and each individual Defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each Defendant by and through its officers, directors, supervisors, and managing agents, and each individual Defendant, authorized and ratified the wrongful conduct that injured Decedent.

16. The Uber Defendants are liable for the acts of each other through principles of *respondeat superior*, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

### III. Jurisdiction and Venue

17. The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

18. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### IV. Facts

   a.   The Scope of Ridesharing in America.

19. Due to regulatory, legislative, and social pressure Uber and Lyft began releasing safety reports providing data on the public use of their platforms and data on the worst types of

safety incidents perpetrated by users of their platforms, namely: Motor Vehicle Fatalities, Fatal Physical Assaults, and most egregious types of sexual assaults.

20. Uber has released three public safety reports: 2017-2018 U.S. Safety Report (Published in December 2019), 2019-2020 U.S. Safety Report (Published in June 2022), and the 2021-2022 U.S. Safety Report (Published August 2024).

21. Lyft has released two Safety Reports: 2017-2019 Community Safety Report (Published in October 2021) and 2020-2022 Safety Transparency Report (Published July 2024).

22. The Safety Reports from Uber and Lyft identify the number of trips that occur on their platforms during the respective reporting periods.

23. Between 2017 – 2022, Uber's Safety Reports indicate that 6.2 billion trips occurred in the United States on the Uber Platform.

24. Between 2017 – 2022, Lyft's Safety Reports indicate that 3.17 billion trips occurred in the United States on the Lyft Platform. Uber's 2020-2021 Safety Report indicates that on Uber's platform alone, 2.5 million trips occurred per day in the United States, or almost thirty (30) rides each second. During this same time period, Lyft connected almost fifteen (15) trips per second took place on the Lyft platform.

    a. Uber and Lyft's Safety Taxonomy and Reported Serious Safety Incidents in the Safety Reports.

25. Prior to the release of the Safety Reports by Uber and Lyft, both companies struggled with systematic categorization of serious safety incidents like physical assault, theft and robbery, sexual assault / sexual misconduct, physical altercations and other serious safety incidents. The companies did not have clear definitions of these categories of violence and therefore could not consistently count them in the system.

26. To normalize the counting of serious safety incidents on Ridesharing platforms, Uber and Lyft worked together to define and then categorize serious safety incidents that occur on their respective platforms. Specifically, Uber and Lyft agreed to use the same methodology to categorize serious safety incidents.

27. In the 2017-2019 Safety Report, Uber claims:

> ## Sexual assault methodology
> In 2018, we partnered with experts from the National Sexual Violence Resource Center (NSVRC) and the Urban Institute to develop a new taxonomy to better understand the reality of unwanted sexual experiences.[21] Prior to this effort, a standardized tool that corporations could use to consistently classify reports of sexual violence received from their consumers did not exist. The taxonomy has since been made open source for use by other companies and organizations.

2017-2018 Uber U.S. Safety Report at 15 (emphasis added with highlight). While this references the Sexual Assault Taxonomy only, Uber additionally made counting metrics for other serious safety incidents such as theft / robbery, physical altercations, vehicle crashes, verbal altercations, inappropriate post-trip contact, Law and Regulatory, Potential Safety Concern, and Dangerous Driving.

28. Uber's Safety 2017-2018 Report goes on to inform the public that its use of a Taxonomy System is meant to prevent future incidents:

> ## Overview of Uber's Safety Taxonomy
> Uber's Safety Taxonomy is a set of categories used to classify and prioritize incoming safety incidents, apply action on individual reports, and inform Uber's efforts to prevent future incidents. The Safety Taxonomy is the basis for measuring and reporting the data needed to understand and improve safety on our platform.
>
> Uber classifies all incident reports according to the description given by the reporting party, and our agents take action according to the appropriate protocol for the initial classification of the report. This approach to classifying reports according to the description of the reporting party is supported by experts[70] and ensures that reports are categorized with as little subjective assessment as possible.

2017-2018 Uber U.S. Safety Report at 34 (emphasis added with highlight).

29. Using the same Taxonomies in their respective Safety Reports, Uber and Lyft decided to report to the public serious safety incident rates between 2017-2022 concerning Motor Vehicle Fatalities, Fatal Physical Assaults, and the five (5) worst categories of Sexual Assault – Non-consensual kissing of a non-sexual body part, attempted non-consensual sexual penetration, non-consensual touching of a sexual body part, non-consensual kissing of a sexual body part, and non-consensual sexual penetration.

30. Between 2017-2022, Uber reported the occurrence of 12,522 Serious Sexual Assaults occurred on the Uber Platform. *See* 2021-2022 Uber U.S. Safety Report at 19.

31. Between 2017-2022, Uber reported the occurrence of 361 Motor Vehicle Fatalities on the Uber Platform, with an increasing rate change of 40% from 2017 to 2022. *See* 2021-2022 U.S. Uber Safety Report at 15.

32. Between 2017-2022, Uber reported the occurrence of 75 Physical Assault Fatalities on the Uber Platform, with an increasing rate change of 96% from 2017 to 2022. *See* 2021-2022 U.S. Uber Safety Report at 18.

33. Between 2017-2022, Lyft reported the occurrence of 6,809 Serious Sexual Assaults on the Lyft Platform. *See* 2020-2022 Lyft U.S. Safety Transparency Report at 13.

34. Between 2017-2022, Lyft reported the occurrence of 216 Motor Vehicle Fatalities on the Lyft Platform, with an increasing rate change of 31% from 2017 to 2022. *See* 2020-2022 Lyft U.S. Safety Transparency Report at 11.

35. Between 2017-2022, Lyft reported the occurrence of 33 Fatal Physical Assaults on the Lyft Platform, with an increasing rate change of 185% from 2017 to 2022. *See* 2020-2022 Lyft U.S. Safety Transparency Report at 12.

b.  The Industry Sharing Safety Program

36. On March 11, 2021, approximately one month before the murder of Elijah Newman, Uber and Lyft announced the launch of a collaborative effort with Lyft to work together to report serious safety incidents between each other in a program called the Industry Sharing Safety Program.[2] Similarly, On March 11, 2021, Lyft announced its participation in the Industry Sharing Safety Program.[3]

37. Indeed, the Industry Sharing Safety Program had been long in the works between Uber and Lyft, with Uber informing the public of its intent to start the program as far back as 2019, as referenced in Uber's first U.S. Safety Report published on December 5, 2019:



> **What's next for safety at Uber?**
> This Safety Report is just one part of our commitment to helping drive accountability in our industry. What matters most are the actions we take to raise the bar. Below are some of our newest investments in safety, along with what we're excited to bring to our users in the future.
>
> **Deactivation sharing**
> We're committed to finding a way to share the names of drivers who have been banned from our platform for the most serious safety incidents with our ridesharing peers. We want companies to be able to use this information to protect their customers.

2017-2019 Uber U.S. Safety Report at 14.

38. From the very beginning, Uber's goal for the Industry Sharing Program was for Uber and Lyft to work together to protect ridesharing customers from "the most serious safety incidents." *Id.*

39. According to Uber's press release, the Program enabled Uber and Lyft (and potentially other companies as well) "to exchange basic information about drivers and delivery people

---

2 https://www.uber.com/newsroom/industry-sharing-safety/#:~:text=SAN%20FRANCISCO%E2%80%94Uber%20and%20Lyft,assaults%20resulting%20in%20a%20fatality.

3 https://www.cnn.com/2021/03/11/tech/uber-lyft-sharing-safety-program/index.html

who have been deactivated for serious sexual assault or physical assault fatalities to help prevent these individuals from operating on another platform."

40. According to Uber and Lyft, "The goal of the Program is to further enhance the safety of the entire ridesharing industry and equip companies with important safety information to protect their customers."[4]

41. **"Safety should never be proprietary. You should be safe no matter what ridesharing platform you choose.** We're thrilled to come together with Lyft to improve safety for the entire industry," said Tony West, senior vice president and chief legal officer at Uber. "Tackling these tough safety issues is bigger than any one of us and this new Industry Sharing Safety Program demonstrates the value of working collaboratively with experts, advocates and others to make a meaningful difference. We encourage more companies to join us." (Emphasis added.)

42. In speaking to CNN about the Program, Tony West stated, **"While Uber and Lyft are fierce competitors on many fronts, I think on this safety issue we agree that folks should be safe no matter what ridesharing platform they choose."** (Emphasis added.)

43. In Uber's 2019-2020 Safety Report, the company stated, "we made good on this promise with the launch of the Industry Sharing Safety Program. This program helps prevent ***any offenders*** from operating on other platforms and potentially harming others." (Emphasis added.) But the Program doesn't do that, because Uber did not share any information about passengers it knew to be dangerous.

---

[4] https://www.uber.com/newsroom/industry-sharing-safety/#:~:text=SAN%20FRANCISCO%E2%80%94Uber%20and%20Lyft,assaults%20resulting%20in%20a%20fatality.

44. Uber and Lyft created the Industry Sharing Safety Program, asserting a shared desire to work together as an industry to improve safety and keep each other informed of actions. Uber and Lyft stated that sharing this information would improve safety for the entire ridesharing industry.

45. In developing the Industry Sharing Safety Program from concept to implementation, Uber and Lyft agreed on data accuracy requirements, to use a shared taxonomy to classify and communicate data, and to maintain certain incident handling standards.

46. Uber and Lyft specifically agreed to share serious safety incidents committed by drivers of their apps to a third-party administrator called HireRight.  Per the program, Uber or Lyft would send HireRight information about a dangerous actor on its platform and HireRight would pass this information along Uber or Lyft. Uber or Lyft were asked to send the following types of information to HireRight concerning a serious safety incident occurring on their platform: name, driver's license, e-mail, account information, phone number, date of birth, social security number and the categorized reason for deactivation.

47. Once Uber or Lyft received a notice from HireRight of a serious safety incident occurring on its app, Uber and Lyft would match the user data and remove the user from their respective platform if the reason for deactivation merited removal. As will be described below, Uber and Lyft **only** shared the worst types of safety incidents through the ISSP, therefore if a report was received through the program, it always was considered grounds for deactivation.

48. The ISSP was designed by Uber and Lyft to allow for speedy reciprocal removals of dangerous actors who use rideshare applications because Uber and Lyft acknowledge that a very high rate of rideshare users are active on both platforms.

49. Uber and Lyft recognized that there was a probability and extreme risk that a dangerous actor who is reported to have committed a serious injury to a rideshare user on one app would likely use other rideshare applications and present dangers of additional serious injuries to people on both apps.

50. Uber and Lyft jointly decided which category of offenses would be included in the program. These decisions were made with the benefit of both the raw data obtained by each company on offenses in Ubers, as well as the published safety reports by each company. The Industry Sharing Safety Program was the result of numerous meetings and communications between Uber and Lyft to discuss the methodology the companies would use to categorize serious safety incidents, which serious safety incidents would be reported, how data would be shared, how to select a vendor to facilitate data sharing, and other obligations between the companies to facilitate the program as a joint effort.

51. Uber and Lyft agreed on the categories of serious safety incidents to report through the Industry Sharing Safety Program to HireRight. Uber and Lyft agreed that it would share information to HireRight concerning the five (5) most serious types of sexual assault and Physical Assault Fatalities.

52. Additionally, Uber and Lyft specifically decided to exclude exchange of serious safety incidents concerning its riders and **only** exchange information about **drivers** through the Industry Sharing Safety Program.

53. Uber and Lyft made the decision to only exchange reports of sexual assault and murder to HireRight through the Industry Sharing Safety Program.

54. Uber and Lyft made the decision to only exchange reports of sexual assault and murder to HireRight through the Industry Sharing Safety Program if the driver was perpetrating the act.

55. Uber and Lyft made the decision to limit the scope of the Industry Sharing Safety Program despite being aware that gun violence, theft, and carjacking is a significant safety threat on Rideshare platforms and that riders commit these offenses far more than drivers.

56. The ISSP was active prior to the murder of Elijah Newman and the burden on Uber and Lyft to also exchange information about riders who commit armed robbery and carjackings was virtually zero.

57. Uber's deliberate decision to omit riders and offenses concerning gun violence from the ISSP left the risk of dangerous passengers unmitigated, even though Uber had everything it needed in order to reduce the risk of armed robberies and carjacking to drivers on both platforms.

    c.  <u>Uber's Agreement with Riders, Privacy Notice with App Users, and Community Guidelines Specifically Contemplate Sharing Safety Data with Third Parties</u>

58. Uber requires riders and drivers to enter into a Terms of Use agreement in order to access the Uber app.

59. In early 2021, near the time that Elijah Newman was murdered by Torian Wilson, Uber's Terms of Use for both drivers and riders described how Uber collects and uses their personal information in connection with Uber Services and dangerous activity. The Terms of Use for riders and drivers on the Uber Platform direct the user to review the Privacy Notice concerning Uber's use of user information.

Uber's Privacy Notice indicates how Uber uses safety incident data connected to a rider or driver's use of the Uber app:[5]

60. As shown above in Uber's Privacy Notice, Uber informs its users (drivers and riders) that Uber can disclose users' data where the disclosure is otherwise appropriate due to safety or similar concerns. *Id.* Additionally the Privacy Notice indicates that Uber's is able to share data "to third parties as necessary to enforce Uber's Terms of Service, user agreements, or other policies, to protect Uber's rights or property or the rights, safety, property of others." *Id.* In other words, Uber expressly reserved the right to share this information but then deliberately chose not to do so.

61. Also, Uber's Community Guidelines set out Uber's safety expectations for riders and drivers and informs users how they lose access to the Uber app for safety violations, including causing physical contact that leads to a user's injury.

62. At least as early as 2021 and continuing to today, Uber's Community Guidelines informs riders and drivers of the following:[6]

> Not following any one of our guidelines may result in the loss of access to all or part of the Uber Marketplace Platform. This can include reported violations of our Community Guidelines and certain actions you may take outside of the Uber Marketplace Platform, including but not limited to information from other platforms, if we determine that those actions threaten the safety of the Uber community, our employees, and contractors, or cause harm to Uber's brand, reputation, or business. If the issues raised are serious or a repeat report, or you refuse to cooperate, you may lose access to the Uber Marketplace Platform. Any behavior involving discrimination, violence, sexual misconduct, harassment, fraud, or deceptive, illegal, or unsafe activity, while using the Uber Marketplace Platform can result in the immediate loss of access to the Uber Marketplace Platform. Additionally, when law enforcement is involved, we will cooperate with their investigation in accordance with our Guidelines for Law Enforcement Authorities for the US, found here, and for outside the US, found here. We may also proactively report suspected criminal behavior to law enforcement in accordance with our Privacy Notice. Lastly, all drivers and delivery people wanting to use the Uber Marketplace Platform undergo a screening process, including motor vehicle record and criminal background checks. A driver or delivery person will lose access to their Uber account(s) if a motor vehicle record check, criminal background check, or other check uncovers a matter relevant to their use of the Uber Marketplace Platform in violation of Uber's standards or other criteria required by local regulators.

community-guidelines&country=united-states&lang=en&uclick_id=f568a4ac-777b-4096-a6eb-07bb96ddbc58 (highlight added for emphasis).

63. Uber informs riders and drivers that information received from other platforms is used for assessing safety threats and for removing individuals from the platform who violate Uber's Community Guidelines, including causing physical harm to users of the platform.

64. Uber's Terms of Service with riders and drivers, Privacy Notice, and Community Guidelines all suggest that Uber shares information with Lyft for the safety of the users of the Uber Application.

65. Uber's marketing of the ISSP program, Terms of Use, Privacy Notice, and Community Guidelines all informed Elijah Newman of Uber's ability to share safety information with Lyft concerning dangerous individuals that violate Uber's policies while using the Uber app.

66. Elijah Newman had zero knowledge that a dangerous rider with multiple prior armed robberies was getting into his vehicle on the night he was murdered. However, Elijah Newman had an expectation that Uber would follow through with Privacy Policy and Community Guidelines and share known serious safety incidents committed by a rider on the Uber Platform in St. Louis, like armed robbery and carjacking, with Lyft so that these incredibly dangerous individuals would be removed from the system.

    d. <u>Torian Wilson was Known by Uber to Be Dangerous Prior to the Murder of Elijah Newman</u>

i. *March 25, 2021: Torian Wilson's First Attack*

67. On March 25, 2021, Brian Blagoue, who was working as an Uber Driver at the time, was carjacked by Torian Wilson in Saint Louis, MO. Shortly after 12:00 p.m. on March 25, 2021, Brian Blagoue received an Uber Trip request through the Uber Application to transport a rider named "Robert" to an address on the 1200 block of Peggy Court in St. Louis, Missouri. Torian Wilson, traveling under the fake name of "Robert" entered the vehicle and Brian Blagoue drove Torian Wilson to Peggy Court.

68. Upon arriving at Peggy Court, Torian Wilson brandished a firearm and ordered Brian Blagoue to turn over his phone and car. Brian Blagoue surrendered his car, phone, and wallet to Torian Wilson. Torian Wilson then fled from Peggy Court in Brian Blagoue's vehicle.

69. Brian Blagoue found a nearby neighbor that allowed him to call 911. When the police arrived, detectives performed an investigation and informed Mr. Blagoue that the St. Louis Police Department would be issuing a request and/or subpoena to Uber requesting additional information about the Uber Rider named "Robert."

70. Brian Blagoue notified Uber that very night that he had been carjacked at Peggy Court by a rider Uber assigned to him named "Robert."

ii. *March 25, 2021: Torian Wilson's Second Attack*

71. At approximately 3:20 p.m. on March 25, 2021 (the same day), Torian Wilson committed a second armed carjacking of an Uber Driver named Wondwossen Hailemariam.

72. Wondwossen Hailemariam received an Uber trip request through the Uber Application to transport a rider named "Robert" to a destination at the intersection of Virginia Avenue

and Itaska Street in St. Louis, Missouri. Once again, Torian Wilson was using the Uber Rider Application under the alias of "Robert" and Uber paired Torian with Wondwossen Hailemariam. Upon arriving at the destination, Torian Wilson produced a firearm and ordered Wondwossen Hailemariam to exit the vehicle. Wondwossen Hailemariam complied and Torian Wilson fled the scene in Wondwossen Hailemariam's vehicle.

73. On information and belief, Wondwossen Hailemariam reported the armed carjacking performed by Torian Wilson to Uber.

74. Wondwossen Hailemariam also reported the carjacking to the St. Louis Police Department. The St. Louis Police Department investigated this carjacking.

75. The reports to Uber of the Blagoue and Wondwossen armed carjackings were made on or around March 25, 2021, nearly a full month before the murder of Elijah Newman.

### iii. April 15, 2021: Torian Wilson's Third Attack

76. Subsequently, on April 15, 2021, Torian Wilson used his Lyft account, registered to the same exact email address ("TorianWilson10@gmail.com") as his Uber account, to order a Lyft driven by Elijah Newman.

77. Torian Wilson used the same fake name (Robert), as well as the same cell phone numbers on both his Uber and Lyft accounts.

78. Torian Wilson also requested the Lyft trip to Peggy Court, which was the same destination as the location where he committed the armed carjacking of Brian Blagoue almost a month earlier.

79. That Torian Wilson used identical information to register for both platforms would have made it easy for Lyft to identify him, had Uber provided Lyft with this information.

80. Upon information and belief, Uber did not provide the information about Torian Wilson's attack to Lyft, as it only shared information about violent attacks by *drivers* but not by passengers.

      e.  <u>Elijah Newman Was a Driver for Uber</u>

81. When Elijah Newman moved to St. Louis, Missouri, he began driving for Rideshare companies in Missouri. Elijah Newman drove for both Uber Technologies, Inc. and Lyft, Inc. as a way to make money.

82. Elijah Newman agreed to Uber's terms of service to drive for Uber, agreed to Uber's Privacy Notice, and agreed to follow Uber's Community Guidelines.

83. On information and belief, Elijah Newman logged into drive for both Uber Technologies, Inc. and Lyft, Inc. on the day he was murdered (April 15, 2021).

84. On April 15, 2021, after 10:00PM, Elijah Newman waited for either Uber or Lyft to provide him a rider to transport in St. Louis, MO.

85. On April 15, 2021, at 10:29 p.m., Elijah Newman received a trip from the Lyft Application where Lyft paired Elijah with a rider named "Robert" at 136 Habecking Drive, St. Louis, MO.

86. Elijah Newman accepted the Lyft Trip and drove to 136 Habecking Drive where two individuals entered Elijah Newman's vehicle. "Robert" was actually Torian Wilson traveling under a pseudonym that he used on both his Uber and Lyft Rider accounts.

87. Upon picking up "Robert" and a passenger who was riding with "Robert," Elijah was instructed by Lyft to transport the riders to 1247 Peggy Court, St. Louis, MO.

88. Elijah Newman transported Torian Wilson and another passenger to the 1200 block of Peggy Court in St. Louis, Missouri.

    f. <u>Elijah Newman's Death</u>

89. At 11:11 p.m. on April 15, 2021, St. Louis Homicide Detectives were requested to the 1200 block of Peggy Court to investigate the scene of a shooting.

90.  According to the Police Incident Report, Elijah Newman was found slumped over in his vehicle with the Lyft application still open in his car with a gunshot wound to his upper back. According to Elijah Newman's death certificate, the cause of death was a gunshot wound to Elijah Newman's neck.

91. After Uber received notice that Elijah Newman had been murdered, Uber worked with the Police to provide additional information concerning Torian Wilson. Using this information, the Saint Louis Police Department were able to apprehend Torian Wilson less than 24 hours after he murdered Elijah Newman.

92. On April 16, 2021, Torian Wilson was arrested.

93. On April 17, 2021, Torian Wilson was charged with first degree murder of Elijah Newman.

94. On October 2, 2023, Torian Wilson pled guilty to Second Degree Murder and armed criminal action of Elijah Newman.  In connection with the plea deal, Torian Wilson was sentenced to twenty-two (22) years in the Missouri Department of Corrections.

95. On April 16, 2021, Brian Blagoue finally heard back from the St. Louis Police when he was called in to look at a photo array to see if he recognized anyone. Torian Wilson was part of the individuals shown to Brian Blagoue on the photo array.  While at the police station, a detective pulled Brian Blagoue aside and informed him that a rideshare driver was murdered the previous night in a botched carjacking on Peggy Court.

96. According to the St. Louis Police Department's incident reports, Torian Wilson used the same personal email, phone number, and cell phone on his Uber and Lyft Accounts.

97. By early March of 2021, Uber and Lyft were sharing information about drivers who commit serious safety incidents with the goal of removing these offenders from both the Uber and Lyft platforms to make the Ridesharing Community a safer place.

98. Uber and Lyft deliberately decided **not** to share serious safety incident information about their riders between the two platforms. Had Uber shared the information with Lyft about the two prior carjackings performed by Uber Rider Torian Wilson on Uber's System, Elijah Newman could be alive today.

## V. Causation

99. As a direct and proximate result of the Uber Defendants' deliberate decision not to share information about Torian Wilson with Lyft, Torian Wilson remained on the Lyft application and murdered Elijah Newman, a man Uber knew to be dangerous.

100.    But for Uber's deliberate decision not to share information about Torian Wilson's dangerous propensities with Lyft, Elijah Newman would not have been murdered during the Lyft Ride because Torian Wilson would have been removed from the platform.

101.    Upon information and belief, had Uber shared information with Lyft about Torian Wilson's prior violent attacks, Lyft would have deactivated Torian Wilson as a passenger, thereby preventing him from requesting a ride from Elijah Newman on April 15, 2021.

## VI. About the Uber Defendants

### g.  Uber Prioritized Growth Over Safety

102.    Uber is a transportation company headquartered in San Francisco, California that pioneered an app-based transportation system that eventually spread through the United States and around the world.

103.	Uber provides an online and mobile application—the "Uber App." The Uber App connects persons seeking transportation with persons who use their personal vehicles to provide transportation in exchange for compensation. Users request and pay for rides through the customer version of the Uber App. Drivers are notified of requested rides, which they can then accept and be compensated for by Uber through the driver version of the Uber App. Both versions of the app connect to the same website, Uber.com, which is Uber's website.

104.	Anyone from the public may download either version of the Uber App for free.

105.	Uber first launched in San Francisco in 2010 as UberCab. At first, it used its mobile phone application to dispatch black Lincoln Town Cars and limousines, operated by licensed professional drivers who worked with regulated, licensed Charter-Party Carrier (TCP) businesses. It branded itself "Everybody's Private Driver."

106.	In 2012, Uber expanded its offerings to include traditional taxi services, and also less expensive rides in unmarked "hybrid and mid-range cars in a variety of colors," still operated by licensed, regulated TCPs. It called these cheaper rides "UberX."

107.	Meanwhile, in 2012, Uber noticed a small, local San Francisco start-up company, Zimride (later re-named Lyft), that facilitated less expensive rides than Uber's by harnessing "ridesharing" where trips were provided by random laypersons rather than professional drivers. This was a radical concept, with some obvious risks.

108.	Uber, which by then had expanded into markets around the world, saw in Lyft's "ridesharing" concept the potential to make a lot more money.

109.	Uber and Lyft created the Rideshare Marketplace, a virtual world that these companies govern, control, and police.

110.     Indeed, Uber and Lyft have been mimicking each other for years in the Rideshare Marketplace, both being keenly aware of the dangers their Rideshare Marketplace presents to the Rideshare drivers.

111.     In 2013, Uber decided to start offering this novel form of application-supported transportation, where Uber would connect individuals who need a ride with individuals who have a driver's license, access to a car, and willingness to offer a ride (so-called "peer-to-peer rides" or "ridesharing"). For the first time, Uber was connecting riders with drivers who were not associated with licensed taxis or TCPs.

112.     Uber's new transportation system was convenient and affordable for the public, and lucrative for Uber. On the other hand, Uber's business model placed a rider who was trusting in Uber's reputation, and a driver about whom the rider and Uber both knew very little, in an isolated setting (a private vehicle) with limited means for the rider to escape if something went awry. This business model foreseeably increased risk of sexual assault, especially for solo women passengers.[3] Uber should have taken action to prevent such assaults, but chose instead to pursue rapid growth at all costs.

113.     In order to keep building this new industry and beat the competition, Uber needed to make the acquisition of drivers and riders as cheap and frictionless as possible. Anything that discouraged riders or drivers from using the product would hurt the bottom line.

114.     At every step, Uber's approach to safety reflected its dominant goals of recruiting riders and drivers with as little friction as possible. Uber chose to achieve growth at the expense of safety. When Uber launched its new transportation system, it did not hire any safety experts nor did it spend a single minute or a single dollar thinking about how to

prevent assault to its users. To this day, Uber's efforts regarding safety are primarily focused on appearing safe, not actually being safe.

115.     At least as early as 2017, Uber and Lyft became aware of sexual assaults and physical attacks involving the Uber app. Uber and Lyft have reported thousands of assaults performed by Riders to Drivers and Drivers to Riders since 2017. Uber and Lyft are aware that app users are physically and/or sexually assaulting and murdering others, including its own drivers, during the course of Uber and Lyft rides.

116.     In the years since, those using Uber and Lyft have continued to sexually assault, harass, kidnap, physically assault, rape, and/or otherwise attack drivers of these platforms.

117.     Complaints to Uber and Lyft by drivers who have been attacked by Uber passengers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber and Lyft have been fully aware of these continuing attacks by individuals using the Uber and Lyft transportation apps.

118.     In spite of Uber's knowledge of this pervasive problem, Uber's response to these ongoing physical assaults by Uber app users has been slow and inadequate and has put the lives and well-being of its drivers at grave risk.

119.     While Uber has, in recent years, publicly acknowledged safety crisis in three Safety Reports— 2017-18 U.S. Safety Report (Published in December 2019), 2019-2020 U.S. Safety Report (Published in June 2022), and the 2021-2022 U.S. Safety Report (Published August 2024).—Uber has failed to implement basic safety measures necessary to prevent these serious physical and/or sexual assaults, which continue to occur to this day.

h.    Uber Controls Who Can Use the App

120.    Uber is the designer and operator of its transportation system, and the designer, manufacturer, operator, and seller of the Uber App that supports that system.

121.    Uber alone decides who can access the Uber App.

122.    On the passenger end, Uber decides who will be approved, and on what terms, to be an Uber account holder and thus be able to use the Uber App. This includes promulgating and enforcing rules regarding age restrictions, number of accounts per person, assignability and transferability of the account, and the ultimate right to approve, delete, or deactivate accounts.

123.    On the driver end, Uber alone decides which drivers it will recruit, who will receive access to its transportation platform, and on what terms. It chooses whether and how to screen those drivers. It alone decides what background checks to use, how far back to look, what prior offenses will be disqualifying, whether and how to onboard drivers in the absence of meaningful background checks (e.g., when a driver has recently moved to the jurisdiction where the background check is conducted), whether to conduct in-person interviews, whether to conduct in-person trainings or orientations, whether to have any in-person interactions with drivers, whether to conduct drug alcohol screenings, and whether to require training or have drivers take exams.

124.    Uber passengers and Uber drivers are subject to Uber's policies and procedures, of which Uber has ultimate authority to enforce.

125.    Uber promises Drivers that their safety is Uber's top priority and that Uber will enforce its policies for both Riders and Drivers to do its part to make ridesharing platforms safe.

126.    Uber designs the way in which the entire transportation experience will work.

127.    Uber selects which driver will be matched with which rider, and the basis on which that match will occur.

128.    Each rider and each driver have a user profile and unique identifying number called a UUID.  Uber tracks data for each user of their system including, phone number, I.P. Address, email address, physical address, GPS locations, complaints, star rating, cancelation rate, requests for reimbursement of past trips, request for appeasements for past trips, and other data.

129.    Uber designs the ride pick-up experience. It sets the pick-up and drop-off location.

130.    When users arrange transportation with the Uber App, they input their destination and request a driver. The Uber App then uses an algorithm to match the user with a nearby driver.

131.    Uber drivers must be logged onto the Uber App and indicate their ability to provide rides to be matched with a rider.

132.    Uber has complete control over the amount of the fare, including additional fees and when to implement dynamic pricing.

133.    Uber collects GPS data and information on its drivers and riders whenever they are using the Uber App, and on riders from at least the time they request a ride until five minutes after they are dropped off.

134.    Similarly, Rideshare drivers who use the Uber and Lyft Rideshare Marketplace receive limited information about passengers and cannot discern whether the passengers have a history of bad behavior on rides.

135.    Uber and Lyft collect communications from the Rideshare Marketplace Users. Both Riders and Drivers contact Uber and Lyft about dangerous occurrences that occur in the

Rideshare Marketplace. All communications must be made through, or to, Uber and Lyft. Uber and Lyft decide what communications can be sent and when.

136.    Uber handles and decides the outcome of all complaints, issues, and grievances regarding the Uber ride from both the driver and passenger.

137.    Uber decides what information it will relay through its Industry Sharing Safety Program with Lyft after Uber receives notice that a user of its platform commits multiple carjackings at gunpoint.

138.    When an Uber driver or rider sends a support message through the Uber App, or calls Uber with a concern or complaint, Uber responds using automated software programming and, where necessary, deploying a global customer support staff that follows Uber's protocols to address the concern or complaint. Uber facilitates, controls, tracks, and records these interactions via its internal customer service software.

139.    Neither drivers nor riders have access to the information in Uber's internal customer service relations platform. Uber has the ability to track and investigate driver and rider misconduct that occurs when drivers and riders use Uber's transportation services, and over time it has increased its actual tracking of driver misconduct.

140.    Additionally, Uber does not share with drivers whether they have received reports of unsafe riders or whether Uber has sent information to Lyft concerning unsafe users of its platform.

141.    In other words, the information necessary to protect Elijah Newman was solely within the hands of Uber, who chose not to share it in a timely manner.

### i.   Uber Profited Off of its Misrepresentations about Safety

142.    In June 2014, Uber's Head of Communications, Lane Kasselman, told NBC Bay Area: "We're confident that every ride on the Uber platform is safer than a taxi."[7]

143.    In 2014, Uber started charging passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[8]

144.    Uber collected the "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue as a result."[9] But it never earmarked the money for improving safety or for the safety-related items it promised.[10] The actual purpose of the "Safe Rides Fee" was to "add $1 of pure margin to each trip."[11] As one former Uber employee said, "[w]e boosted our margins saying our rides were safer. … It "was obscene."[12]

---

[7]    *NBC Bay Area, Is Uber Keeping Riders Safe (Nov. 29, 2019), https://www.nbcbayarea.com/news/local/is-uber-keeping-riders-safe/70922/*
[8]    *Uber Support, What is the Safe Rides Fee, https://web.archive.org/web/20140420053019/http://support.uber.com/hc/en-us/articles/201950566*

[9] *Isaac, Super Pumped, at 135-36.*
[10] *Id.*
[11] *Id.*
[12] *Isaac, Super Pumped, at 135-36.*

145.     Uber has actively marketed and successfully cultivated an image among its customers of safety and superiority to public transportation and traditional taxis – which is reflected in its very name.[13]

146.     Over the years, Uber's marketing has consistently promoted the theme of safety to entice drivers to stay behind the wheel. In its early years, Uber advertised the "safest rides on the road" and designed ads showing children using its service. For example, Uber's Safety page displayed this ad:

147.     In 2017, following its fraud settlements, Uber subtly changed its advertising to be slightly more vague, but still misleading. It advertised: "From start to finish, a ride you can trust" and "[S]afe rides for everyone: Whether riding in the backseat or driving up front, every part of the Uber experience is designed around your safety and security." It also described "How we keep you safe" and proclaimed, "Trip Safety, Our Commitment to Riders." It further proclaimed: "Uber is dedicated to keeping people safe on the road."

148.     In 2018, Uber continued advertising: "Safety, Our commitment to riders and drivers. Uber is dedicated to keeping riders and drivers safe on the road."

149.     In 2019, Uber continued advertising, "Your safety is always a top priority. We're committed to helping drivers and riders get where they want to go with confidence." It also advertised that it was "Building safer journeys for everyone." Uber CEO Dara

---

[13] *Dictionary.com defines "uber" as "designating a person or thing that exceeds the norms or limits of its kind or class."*

Khosrowshahi said "Helping keep people safe is a huge responsibility and one we do not take lightly."

150.     From 2021 through the present, Uber has continued prominently advertising "Our commitment to your safety," and told the public it was "Focused on safety, wherever you go." It also said "we're committed to helping to create a safe environment for our users."

151.     To this day, Uber falsely maintains that safety is its top priority[14] and still reassures drivers that they can "drive with confidence."

---

[14] *See Uber, About Us,* https://www.uber.com/se/en/about/?uclick_id=c0abc880-f3dd-428b-b9efd82bf674772c *(touting "safety is a top priority every single day"); Uber, Ride Safety,* https://www.uber.com/se/en/ride/safety/ *(claiming that Uber is "[d]riving safety forwards[,]" that "[y]our safety is our priority" and that "[w]e never stop working to reduce incidents and set new standards, so you can stay connected and protected every time you ride with us. Because safety never stops").*



     j.   <u>Uber Knew Long Before Elijah Newman Was Murdered that Driving for Uber Is Unsafe</u>

152.     Reasonably careful and responsible businesses adopt a "think before you act" way of doing business. They do not just think about how to make money, but also about the effects their actions will have on others, including on public safety. They think about whether their business will put people at risk, including the risk of crime, and they think about how to reduce any such risk.

153.     Transportation companies have a particular duty to keep both drivers and passengers safe. By offering transportation services, such companies assert that they can be trusted to safely transport someone from one place to another. Riders who get in a plane, train, taxi, or Uber, are trusting that the transportation company will keep them safe.

Similarly, drivers who drive for Rideshare Companies trust that the companies are using the information it collects to ensure a safe ride for them too.

154. More so than other businesses, transportation companies have to think about and address the ways that passengers and drivers could be harmed, including the risk of crime in connection with the pick-up, transport, or drop-off process.

155. The foreseeable use environments for Uber's transportation system include riders who use both the Uber and Lyft apps and perform carjacking and violence toward drivers.

156. As referenced above, Uber has released three safety reports, each of which show a dramatic increase in violence, including gun violence, on the Uber Platform year of year.

157. Likewise, Lyft has released two safety reports, each of which show a dramatic increase in violence, including gun violence, on the Lyft Platform year over year.

158. Uber and Lyft's Safety Reports discuss their shared Taxonomy metrics, which track all types of safety incidents committed on their platforms, including carjacking, armed robbery physical assault, sexual assault and others.

159. Uber riders have a long history of armed carjacking that Uber has tracked through its Taxonomy system.  Armed robberies and carjackings by app users has plagued Uber since Uber started the Ridesharing industry. As Uber has grown, it's systems have become extraordinarily sophisticated for tracking carjacking, armed robbery, and other serious incidents on their platform.

160. Despite having specific information about carjackings nationwide and in St. Louis, MO, Uber chose to omit these from their Safety Reports and from reporting through the ISSP.  Uber made this choice because the numbers of armed robberies and carjackings are

30

much higher than what the public believes. Uber's choice to withhold this information is based on Uber's desire to make its platform be perceived as safer than it really is.

161.     Uber never provided information of platform armed robberies and carjackings to Elijah Newman and specifically chose not to include this information in the Industry Sharing Safety Program.

## VII. Allegations Supporting an Award of Punitive Damages

162.     Uber acted intentionally, recklessly, wantonly, maliciously, and fraudulently.

163.     As alleged above, Uber knew it faced an ongoing problem of its drivers being physically and sexually assaulted.

164.     For years prior to the death of Elijah Newman, Uber had received complaints of carjackings, physical assaults, and sexual assaults and was therefore on notice not only that Mr. Newman's death was possible, but also foreseeable.

165.     Moreover, Uber is aware that both Drivers and Riders in the Rideshare Marketplace use both the Uber and Lyft app regularly. This knowledge resulted in Uber and Lyft creating the Industry Sharing Safety Program. Uber and Lyft understand that they must work together to reciprocally remove dangerous users from their systems when either Lyft or Uber become aware that a user (Rider or Driver) are dangerous.

166.     Nevertheless, even though Uber was fully aware of its safety problems, it failed to take safety precautions to protect its drivers.

167.     The decision not to implement safety measures was driven by Uber executives' desire for rapid expansion and increased profits, because the more rides Uber could generate, the more money it made.

168.     Prioritizing profits over safety, Uber and its executive officers also made the conscious decision to exclude warnings about riders who commit armed robberies and carjackings on the Uber platform to Lyft, despite knowing that these riders present a foreseeable risk of assaulting, carjacking, and murdering drivers on the Lyft system.

169.     Additionally, Uber tracks users who its Taxonomy indicates are risky.  Torian Wilson's use of a pseudonym, payment method, and passed Taxonomy infractions while on the Uber system categorized him as a risky user of the platform.  Despite Uber's knowledge that Torian Wilson exhibited all the traits of a high-risk User, Uber continued to allow Torian to use its platform and refused to provide Lyft with information that would have resulted in the reciprocal removal of Wilson from both the Uber and Lyft platforms.

170.     Safety precautions such as electronic monitoring systems; full transparency with other Rideshare Marketplace providers like Lyft concerning safety issues, full transparency with law enforcement and timely responses to Law enforcement's request for information, ongoing monitoring of Uber passengers and rides through available technology including cameras and GPS; a zero-tolerance policy for passengers who deviate from expected behavior by threatening or physically assaulting drivers; a system for checking in with and verifying a driver's safety when a ride prematurely terminates or significantly deviates from the intended route; a zero-tolerance program for sexual and physical assault and guidelines mandating immediate termination; creating and instituting a system encouraging customer reporting; adequate monitoring of customer and driver complaints by well-trained and effective customer-service representatives; warnings to drivers of the dangers of being attacked by Uber passengers; and cooperation with law enforcement when a passenger attacks a driver would have cost Uber money and reputational damage.

Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its drivers and passengers at greater risk of carjacking and physical assault, among other things by Uber's passengers.

171.    Prioritizing profits over passenger and driver safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiffs, Decedent, and the public.

172.    Uber also misrepresented the safety of its rides to Plaintiffs and the public, intentionally and actually inducing reliance on those statements and omissions.

### Claims for Relief

173.    Each claim incorporates all allegations above.

### Count I: Negligence - Common Law Public Policy

174.    Under Missouri Law, no universal test for duty has ever been formulated. *Gunnett v. Girardier Building and Realty Co.*, 70 S.W.3d 632, 639 (Mo.App.E.D.2002) *citing* W. Keeton, Prosser and Keeton on Torts, section 53 at 358 (5th edition, 1984).

175.    The statement that a duty does or does not exist begs the essential question—"whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Gunnett* at 639. For duty is "only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id*.

176.    The question of whether common law duty will be imposed in Missouri on public policy grounds rests upon several policy factors, including:

   b.  the social consensus that the interest is worthy of protection,

    c.  the foreseeability of the injury and the degree of certainty that the protected person suffered injury,

    d.  the likelihood of the injury,

    e.  the moral blame society attaches to the conduct,

    f.  the prevention of future harm,

    g.  consideration of cost and the ability to spread the risk of loss, and

    h.  the consequences of placing that burden on the defendant.

*Gunnett* at 639; *see also Strickland v. Taco Bell Corp.,* 849 S.W.2d 127, 132 (Mo.App. E.D.1993).; *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc./Special Products, Inc.,* 700 S.W.2d 426, 431–2 (Mo. banc 1985).

    1.  <u>Social Consensus</u>

177.    As it relates to the social consensus that Elijah Newman and the public's interest is worth of protection, the Rideshare industry in America is a multi-billion-dollar enterprise and has been pushed by Uber and Lyft to be a social norm for transportation.  Uber and Lyft offer billions of rides on their platforms per year and, according to their safety reports, By 2021 Uber and Lyft were pairing more than **40 rides per second** in America.

178.    According to the United States Census Bureau, approximately 332 million people were alive in the United States 2021. According to Uber and Lyft's safety reports, over 2 billion Uber and Lyft rides occurred between 2021-2022. At minimum two people living in the United States were in each of these trips, but in reality a large majority of these trips had 3 or more people in the vehicle.

179.     Use of the Uber and Lyft platforms have reached an unforeseen level of social normality that has resulted in many billions of individuals in America using the ridesharing apps every year.

180.     Uber and Lyft have committed publicly that they will do everything they are able to make ridesharing as safe as possible for the public. Uber and Lyft negotiated for months over what information to exchange through the Industry Sharing Safety Program about its violent users. These companies contemplated sharing information about dangerous rideshare riders on their platform but intentionally excluded rider from the program, including rider offenses like armed robbery and carjacking.  Uber and Lyft made this decision because the rates at which rider armed robbery and carjacking occur would expose a substantial safety problem in the Uber and Lyft rideshare communities.

181.      Uber and Lyft negotiated the terms of the Industry Sharing Safety Program and chose to withhold information about its most dangerous riders, i.e. those that commit armed robbery, carjackings, murder, and sexual assault.

182.     Uber and Lyft made the conscious decision to withhold evidence about dangerous riders from the ISSP and from the public so that drivers living in America would be unaware of the danger and continue to choose to drive on their platforms.

183.     Millions of trips occur every year in Missouri on the Uber and Lyft app. From a social consensus standpoint, Missourians have an overwhelming interest in Uber acting when it is aware of dangerous riders like Torian Wilson. This court should recognize that the  interest by the people of Missouri is worthy of protection.

   2.  Foreseeability of the Injury and Degree of Certainty that the Protected Person Suffered Injury.

184.    Uber and Lyft track rider safety infractions on their system and identify riders who have a high risk of committing Safety Taxonomy Violations. Uber and Lyft pair these high-risk riders with drivers for transportation on their platforms.

185.    Uber receives millions of complaints against bad-acting riders every year from drivers, including confirmed reports of riders committing murder, armed robbery, carjackings, and thousands of sexual assaults against drivers.

186.    Uber's Terms of Use, Privacy Statement, and Community Guidelines all contemplate sharing information with third parties, including sharing information with other Rideshare Companies, concerning dangerous riders who commit serious safety incidents on the Uber Platform.

187.    Uber and Lyft established the Industry Sharing Safety Program because they are aware that rideshare users use both Uber and Lyft apps.  The companies understand that it is overwhelmingly foreseeable that an individual who commits a heinous act of violence on the one of these rideshare  platforms will likely expose users of the other platform to the same type of danger.

188.    Uber has made the choice that riders on its platform deserve to be protected from drivers through the Industry Sharing Safety Program as it relates to physical assault fatalities and five (5) categories of the worst types of sexual assault.

189.    However, riders are only half of the equation in the arithmetic of rideshare. Uber and Lyft could not offer services without drivers on their platforms. Uber and Lyft refusing to offer protection to drivers through the Industry Sharing Safety Program exposes drivers to great danger from known violent riders.

190.     Uber and Lyft's decision to convey information between each other about violent drivers and their violent acts against riders is evidence of foreseeability that rideshare users who commit violence on one app will commit violence on the other app.

191.     Uber and Lyft's decision to convey information between each other about violent drivers and their violent acts against riders is additionally evidence that Uber and Lyft have a degree of certainty that riders suffer injuries from drivers who have a history of violence while driving for rideshare companies.

192.     Uber and Lyft know that drivers are the subject of violent robberies, carjackings, murders, and sexual assaults.  Uber has a degree of certainty that riders who commit armed carjackings will do it again and are likely to escalate violence in later trips. Uber and Lyft both know that it is foreseeable that a known violent rider on one rideshare application will commit the same or escalated violence on another ridesharing application.

### 3. Likelihood of the Injury to Elijah Newman

193.     Torian Wilson committed two carjackings on the Uber platform on March 25, 2021.

194.     In the March 25, 2021 carjackings by Torian Wilson on the Uber platform, Wilson used a gun to hold-up the Uber drivers.  Wilson forced the drivers out of their vehicles using the gun and stole  the Uber drivers' vehicles.

195.     Uber received information about these carjackings immediately from the Drivers and were contacted by the St. Louis Police about these carjackings.

196.     Consistent with Uber's Terms of Service and Community Guidelines, Torian Wilson's access to the Uber application was suspended by Uber.  Uber suspends known violent riders from their platform to prevent the rider from committing future violence against Uber drivers or other Uber passengers.

197.    Uber is aware that Uber riders use the Lyft application in St. Louis and that there was a likelihood that Torian Wilson would use the Lyft application once his access to the Uber application was suspended. Uber is aware that individuals who commit armed robbery on a Rideshare platform are likely to repeat the offense if given the opportunity and that use of a firearm in a robbery has a likelihood of someone being shot.

198.    Uber knew that Elijah Newman was an Uber driver and is aware that a large portion of Uber drivers (likely a majority) also drive for Lyft.

199.    Uber knew that a dangerous actor on its app is a danger to users of the Lyft app and that there was a high likelihood that a driver for Lyft would be the subject of gun violence at the hands of Torian Wilson.

200.    The likelihood came to fruition when Torian Wilson attempted his third known rideshare armed carjacking. Since Uber did not share information about Torian Wilson being a substantial danger to Lyft, Torian Wilson was able to perform his third armed carjacking on a Ridesharing platform. The exact same scenario occurred to Elijah Newman as occurred to Brian Blagoue and  Wondwossen Hailemariam, except this time Elijah Newman did not give up his vehicle to Torian Wilson. When Torian Wilson realized Elijah Newman was not going to turn over his vehicle, Torian Wilson shot and killed Elijah Newman.

201.    Uber's systems and historical review of data concerning their customers confirms that Torian Wilson was likely to continue to commit armed violence using rideshare applications and that it was likely the violence would increase resulting in the use of a deadly weapon.

    4.  Moral Blame Society Attaches to the Conduct

202.    As shown above, use of the Uber and Lyft application in America is prolific and is part of the daily life of millions of individuals living in America.

203.    Those using the Uber and Lyft apps are informed that safety is Uber and Lyft's top priority and are encouraged to use Uber and Lyft as a safe option for transportation at all times.

204.    Uber and Lyft have moved their transportation services into every State in America.

205.    Hundreds of thousands of rideshare drivers connect to the Uber and Lyft applications to transport millions of riders every single day in America.

206.    The facts in this matter are unique because Uber was aware of multiple prior carjackings performed by Torian Wilson **and did nothing.**

207.    Even in the absence of the Industry Sharing Safety Program, Uber's Rider Terms of Use, Privacy Notice, and Community Guidelines allow Uber to share information with third parties, including Lyft, as it relates to safety concerns.

208.    Uber's conduct of withholding information about Torian Wilson from Lyft that would have resulted in Wilson's removal from the Lyft system engenders moral blame from the American society. When one recognizes that these acts by Uber allowed for Torian Wilson to be paired with Elijah Newman and for Elijah Newman's murder, the moral blame associated to these acts by society becomes overwhelming.

5. Prevention of Future Harm

209.    When Uber becomes aware of violent robberies on the Uber app perpetrated by riders or drivers, Uber can prevent future harm on rideshare applications by informing Lyft of the violence. Use of weapons in a rideshare is an infraction against both Uber and Lyft's

policies and company policy requires immediate removal of the user's access to the rideshare platform.

210.     Uber has the ability to transfer this information under its Terms of Use, Privacy Notice, and Community Guidelines.

211.     Additionally, Uber already has contracted with HireRight, a third-party administrator, to relay information to Lyft about violent users of the Uber platform.

212.     If Uber and Lyft share information about violent users of their platforms, each platform is working to prevent future harm to its users.

### 6. Consideration of Cost and Ability to Spread Risk of Loss

213.     It is undeniable that Uber's cost of reporting to Lyft information about known violent riders on the Uber platform is increasingly low, if not zero.

214.     Uber's electronic systems and portals are designed for efficient transfer of information and are subject to daily updates by internal Uber employees.

215.     In Uber's billion-dollar industry, Uber's transfer of electronic information about violent riders to Lyft in connection with Uber's Terms of Service, Privacy Notice, and Community Guidelines is not cost prohibitive.

216.     Additionally, Uber already has the Industry Sharing Safety Program in place where it incurs costs related to sharing information to Lyft concerning violent drivers who commit serious safety incidents on the Uber Platform.  The increased cost, if any, to also relay information to Lyft about violent riders is not prohibitive.

217.     If Uber and Lyft shared information about violent riders on its platform, it would reduce violence on the platforms in general and spread Uber's potential economic loss by

reducing litigation exposure and improving societal sentiment that Uber is devoted to the safety of its users.

### 7. The Consequences of Placing the Burden on the Defendant

218.    As stated above, Uber already claims to be devoted to safety for its users.

219.    Uber and Lyft already employ thousands of customer representatives whose job requires them to receive and adjudicate reports of violence committed by riders against drivers.

220.    Uber and Lyft already have systems in place to remove violent riders from their respective platforms.

221.    Uber and Lyft already analyze reports and data of violent riders.

222.    Uber and Lyft have already created the Industry Sharing Safety Program and convey information back and forth concerning dangerous and violent drivers who use rideshare applications.

223.    Uber does not have to create any system or hire any new employees to be able to convey information to Lyft about known violent riders who commit armed robbery and carjackings.

224.    The burden to Uber to inform Lyft of violent riders who commit armed robbery and carjackings is extremely low.

### i. Due to Public Policy, Uber owed Elijah Newman a duty to act with reasonable care.

225.    Uber owed Decedent a duty to act with reasonable care.

226.    This is reinforced by Uber's distribution and promotion of its platform and the safety of it for both drivers and passengers.

227.     Uber further owed a duty to convey known information of prior armed robbery and carjacking by Uber riders to protect rideshare drives from known, dangerous passengers because the risk of harm to Elijah Newman was embedded in and an inherent risk of its negligent business practices.

228.     Uber owed a duty to Elijah Newman because it controlled the information of Torian Wilson's armed robberies and carjackings and whether it was shared with Lyft.

229.     Uber owed a duty because its prior conduct created a risk of harm to drivers such as and including Elijah Newman, and it caused them actual harm.

230.     Uber owed a duty because it offered and contracted to provide rides to the public, and this offer carried an implied warranty that it would provide rides safely.

231.     Uber owed a duty to drivers on both Uber and Lyft platforms when it advertised its Industry Sharing Safety Program and voluntarily undertook a duty to share information about violent offenders with other platforms like Lyft.

232.     Uber further understood that its failure to share information with Lyft could have dire consequences for other drivers and passengers, including Elijah Newman.

233.     Although Uber did not share deactivated rider information with Lyft, it had every ability to do so and further assumed the duty to do so in proclaiming that "Safety should never be proprietary. You should be safe no matter what ridesharing platform you choose," and "While Uber and Lyft are fierce competitors on many fronts, I think on this safety issue we agree that folks should be safe no matter what ridesharing platform they choose."

234.     Uber further failed to maintain, implement, and follow policies such as the rideshare user's Terms of Use, Privacy Notice, and Community Guidelines that would have

resulted in the deactivation of dangerous riders and the sharing of information relating to dangerous riders like Torian Wilson.

235.    Elijah Newman's murder was a foreseeable risk of Uber's business model and practices.

236.    Uber failed to exercise reasonable care in deciding not to share information about Torian Wilson with Lyft.

237.    Uber breached its duty by deliberately deciding not to share information with Lyft about its own passengers who had been deactivated for violent offenses, such as and including Defendant Torian Wilson.

238.    Uber failed to act as a reasonably prudent company when it decided not to share information about its deactivated passengers with Lyft.

239.    Uber's failure to share information about deactivated passengers increased the risk of harm both to Uber and Lyft drivers, including Elijah Newman.

240.    Uber was in a uniquely superior position to understand the danger posed by Torian Wilson and other violent passengers to both Uber and Lyft drivers.

241.    At the time of Elijah Newman's death, Uber had actual knowledge that Torian Wilson was a danger to rideshare drivers, as he had already committed armed robbery and armed carjacking of two Uber drivers.

242.    As a direct and proximate results of Uber's negligence, Lyft did not receive information about Torian Wilson's prior armed robberies and carjackings, Torian Wilson was allowed to retain access to the Lyft app, Elijah Newman was murdered, and Elijah Newman and Plaintiffs suffered damages.

243.     The conduct of the Uber Defendants as described above demonstrates willful, wanton, and malicious conduct, as well as a complete indifference to or conscious disregard for the safety of Elijah Newman and others, thereby justifying an award of damages for aggravating circumstance in such a sum that will serve to punish the Uber Defendants and to deter Uber and others like them from similar conduct in the future.

## PRAYER FOR RELIEF

244.     Plaintiffs and Decedent suffered injuries and damages, for which they seek relief. These damages include, but are not limited to, Decedent's fear of imminent bodily harm, the actual bodily harm, death, medical expenses, loss of future wages and financial support, pain and suffering, funeral and burial expenses, and the loss of love, services, consortium, instruction, guidance, counsel, and support of Elijah Newman.

Plaintiffs therefore pray for the following relief:

  a.  Entry of judgment on each of their claims against Defendants jointly and severally;

  b.  Past and future economic and non-economic damages including physical pain, mental anguish, anxiety, medical expenses, lost earnings or earning capacity, funeral expenses, loss of dependent care, and any other damages as permitted by law;

  c.  Punitive damages;

  d.  Pre- and post-judgment interest;

  e.  The costs and expenses of litigation;

  f.  Attorneys' fees;

  g.  Equitable relief; and

  h.  Such other relief as this Court may deem just and proper.

Dated: December 23, 2024

*/s/ Bret Stanley*
Bret Stanley
**The Stanley Law Firm, PLLC**
2925 Richmond Avenue
Houston, TX 77098
Tel.: 512-695-6146
Bstanley@stanleypllc.com

Marlene J. Goldenberg (*Pro Hac Vice forthcoming*)
**Nigh Goldenberg Raso & Vaughn PLLC**
14 Ridge Square NW, Third Floor
Washington, DC 20016
Tel.: (202) 978-2228
Fax: (202) 792-7927
Mgoldenberg@nighgoldenberg.com

 Christopher Brett Vaughn (Mo. Bar No. 66974)
**Nigh Goldenberg Raso & Vaughn PLLC**
12022 Blue Valley Pkwy, Suite #1020
Overland Park, KS 66213
Tel.: (913) 800-8518
Fax: (202) 792-7927
Bvaughn@nighgoldenberg.com

Samantha V. Hoefs (*Pro Hac Vice forthcoming*)
**Nigh Goldenberg Raso & Vaughn PLLC**
14 Ridge Square NW, Third Floor
Washington, DC 20016
Tel.: (612) 445-0202
Fax: (202) 792-7927
shoefs@nighgoldenberg.com

*Attorneys for Plaintiff*